IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  4:19 CR 827 AGF |
| v. | ) | |
| | ) | |
| ELIJAH MOORE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

GOVERNMENT'S SENTENCING MEMORANDUM

COMES NOW the Plaintiff, United States of America, through its attorneys, Sayler A. Fleming, United States Attorney for the Eastern District of Missouri and Sirena Miller Wissler and Nauman Wadalawala, Assistant United States Attorneys, and submits this memorandum in support of its request that defendant Elijah Moore ("Moore") be sentence to an aggregate prison term of 420 months.

**STATEMENT OF RELEVANT FACTS**

On October 3, 2019, a duly empaneled Grand Jury sitting in the Eastern District of Missouri returned an Indictment against defendant Moore, charging the following offenses:

Count I -  Attempted Murder of a Federal Officer in violation of Title 18, United States Code, Section 1114;

Count II --  Discharge of a Firearm in Furtherance of a Crime of Violence in violation of Title 18, United States Code, Section 924(c)(1)(A);

Count III --  Attempted Murder of a Federal Officer in violation of Title 18, United States Code, Section 1114;

1

Count IV --   Discharge of a Firearm in Furtherance of a Crime of Violence in violation of Title 18, United States Code, Section 924(c)(1)(A);

Count V – Felon in Possession of a Firearm in violation of Title 18, United States Code, Section 922(g);

Count VI -- Carjacking in violation of Title 18, United States Code, Section 2119, and;

Count VII --  Discharge of a Firearm in Furtherance of a Crime of Violence in violation of Title 18, United States Code, Section 924(c)(1)(A).

(Doc. #1).

 Moore made his initial appearance before United States Magistrate Judge Nannette A. Baker on October 8, 2019. (Doc. #7).  Because Moore had also been charged in the 11th Judicial Circuit Court in and for St. Charles County (MO) with offenses arising from the facts giving rise to the instant case, Moore appeared pursuant to a writ of habeas corpus ad prosequendum. Magistrate Judge Baker appointed the Office of the Federal Public Defender to represent Moore. (Doc. #8).

The government moved that Moore be detained without bond pending trial. (Doc. #6).  The government filed a detailed motion in which it noted the statutory presumption of detention pursuant to Title 18, United States Code, Section 3142(e)(3).  (Doc. #6, p. 2).  The government argued that the circumstances of the offenses charged in the Indictment, along with Moore's criminal history, demonstrated that Moore was both a risk of flight and a danger to the community. (Doc. #6, p. 1).  The United States Pre-Trial Services Office prepared a Bail Report in which it assessed Moore's flight risk and danger to the community, ultimately concurring in the government's recommendation that Moore be ordered detained. (Doc. #12).  On October 8, 2019,

Moore appeared before Magistrate Judge Baker and waived his right to a detention hearing. (Doc. #11).

Magistrate Judge John M. Bodenhausen arraigned Moore on the Indictment on October 17, 2019. (Doc. #19). At the arraignment, Magistrate Judge Bodenhausen established a deadline of December 10, 2019 for the filing (or waiver) of pre-trial motions. (Doc. #20). Following multiple extensions of that deadline, Moore waived his right to file pre-trial motions on May 19, 2020. (Doc. #32). Then, on June 16, 2020, the parties filed a joint motion for a consolidated plea/sentencing hearing.[1] (Doc. #35).

Moore appeared before this Court via video teleconference for a change of plea hearing on November 20, 2020. (Doc. #55). His plea was made in conjunction with a written Guilty Plea Agreement offered pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). (Doc. #56). The terms of the agreement provided that upon Moore's change of plea to Counts I, II, III, and VI of the Indictment, the government would move for the dismissal of Counts IV, V, and VII at the time of sentencing. (Doc. #56, ¶2). In addition, the parties agreed that at the time of sentencing, Moore would request a sentence of no fewer than 300 months, and the government would request a sentence of no more than 420 months. (Doc. #56, ¶2). In the event the Court accepts these terms and sentences Moore within that range, both parties waive their right to appeal the sentence. (Doc. #56, ¶7(a)(2)). Should the Court elect not to sentence Moore within that range, the parties maintain their right to withdraw from the plea agreement in accordance with Fed. R. Crim. App. 11(c)(5). (Doc. #56, ¶2).

In anticipation of the combined plea/sentencing hearing, the United States Probation Office prepared a Pre-Sentence Investigation Report. The initial, "disclosure" copy of that report was

---

[1] Moore ultimately elected to proceed with separate plea and sentencing hearings and requested that his sentencing hearing be conducted in person, as opposed to by way of video teleconference.

filed on August 17, 2020. (Doc. #38).  Moore filed a single objection to that report, in which he protested the characterization of him as a member of the Aryan Brotherhood. (Doc. #39).  The Probation Office declined to remove the reference and, as a result, Moore's objection remains unresolved. (Doc. #60, ¶76).   The Final Pre-Sentence Investigation Report establishes a Total Offense Level of 37 and a Criminal History Category of VI. (Doc. #60, ¶¶37, 70). Based upon the Total Offense Level, the Criminal History Category, and applicable mandatory minimum sentences, Moore's advisory guidelines range is 480 months to life.  (Doc. #60, ¶106).  Although Moore's Sentencing Memorandum does not contain a specific recommendation, the Guilty Plea Agreement suggests that Moore will request a sentence of 300 months.  (Doc. #56, ¶2).

## ARGUMENT

It is now axiomatic that "[I]n *United States v. Booker,* the Supreme Court struck the statutory provisions that made sentencing within the U.S. Sentencing Guidelines mandatory." United States v. Bueno, 443 F.3d 1017, 1022 (8th Cir. 2006) (internal citation omitted).  Although federal sentencing jurisprudence has changed considerably since the Supreme Court decided Booker,

> [t]he appropriate guidelines range, though now calculated under an advisory system, remains the critical starting point for the imposition of a sentence under § 3553(a).  ("[T]he sentencing court must first determine the appropriate guidelines sentencing range, since that range does remain an important factor to be considered in the imposition of a sentence."); When a district court exercises its discretion to depart or vary from the appropriate guidelines range, it must continue to provide the reasons for its imposition of the particular sentence.

United States v. Mashek, 406 F.3d 1012, 1016 n.4 (8th Cir. 2005) (internal citations and quotations omitted); United States v. VandeBrake, 679 F.3d 1030, 1039 (8th Cir. 2012) ("district court properly calculated the advisory guidelines sentencing range at step one of the sentencing

process"). In the instant case, the range of punishment recommended by the Sentencing Guidelines is 480 months to life. (Doc. #40, ¶106).

After ruling on defendant's lone objection to the Pre-Sentence Report and correctly calculating the advisory Guidelines range, the Court must proceed to the second step in the sentencing process.[2] "Once the applicable range is determined, the court should then decide if a traditional departure is appropriate under Part K and/or § 4A1.3 of the Federal Sentencing Guidelines. Those considerations will result in a 'guidelines sentence.'" United States v. Haack, 403 F.3d 997, 1003 (8th Cir. 2005). In the instant case, neither party has moved for a traditional departure under the guidelines. Therefore, all that remains is for the Court to conduct the final analysis required before sentence is imposed. "[O]nce the guidelines sentence is determined, the court shall then consider all other factors set forth in § 3553(a) to determine whether to impose the sentence under the guidelines or a non-guidelines sentence." Id.

As a preliminary matter, the United States Probation Office suggests that the "Court may wish to consider whether the circumstances of the offense and the characteristics of the defendant rise to the level that would warrant a sentence below the guideline range." (Doc. #60, ¶131). While acknowledging that this comment "does not necessarily constitute a recommendation by the probation office for a variance," the Government feels compelled to note that its recommended sentence of 420 months *does constitute a variance* of some 60 months from the low-end of the advisory guidelines range. The Government adamantly opposes any further downward variance.

Title 18, United States Code, Section 3553(a) provides that prior to determining the sentence to be imposed, this Court must consider:

---

2 The resolution of Moore's objection will have no impact on the sentencing guidelines calculation as contained in the Final Pre-Sentence Investigation Report. (Doc. #60).

1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

2)  the need for the sentence imposed --

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B) to afford adequate deterrence to criminal conduct;

> (C) to protect the public from further crimes of the defendant; and

> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3)  the kinds of sentences available;

4)  the kinds of sentences and the sentencing range established for--

> (A) the applicable category of offenses committed by the applicable category of defendant as set forth in the guidelines...

5)  any pertinent policy statement ---

> (A) issued by the Sentencing Commission...

6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct...

The Government shall endeavor to address each of these factors in turn.

## I.    The Nature and Circumstances of the Offense

Few cases that come before this Court present as more serious than the instant case. In pleading guilty to multiple charges, Moore admitted that he shot at United States Marshals Service Task Force Officer – R.J. - and at least one St. Charles County detective – D.L. - who was assisting him in attempting to apprehend Moore. (Doc. #56, ¶4).   Utilizing two children as human shields, Moore then escaped, only to carjack a truck by firing a gunshot to ward off its owner.  Moore led dozens of law enforcement officers on a high-speed chase, shooting indiscriminately at untold

numbers of officers as he fled. The chase ended only when Moore crashed the stolen truck.  Once again, gunshots were exchanged, and SWAT personnel were able to take Moore into custody. (Doc. #56, ¶4).

It is no exaggeration to observe that R.J. and D.L. are fortunate to be alive.  Although they were themselves armed as Moore shot at them, they were powerless to return fire as Moore had positioned two children between himself and the officers.  Even in their desperation to stop Moore, R.J. and D.L. would not risk harming the children or the female driver of the blue Mustang in which Moore had fled.[3]  The presence of these innocent victims of Moore's rampage left R.J. and D.L. virtually defenseless, despite the weapons at their disposal.[4]  They watched in frustration as Moore ran into the woods.

Unfortunately, R.J. and D.L.'s worst fears were realized when, following his escape, Moore victimized others.  Recognizing that he needed a vehicle in which to escape law enforcement's ever-shrinking dragnet, Moore carjacked a vehicle.  When two citizens attempted to stop Moore, again used his stolen weapon to make good his escape.  Thereafter, he used the stolen truck to flee from law enforcement during a protracted chase over well-traveled highways.  As he did so, Moore continued to shoot at law enforcement officers, endangering not only the officers themselves but countless members of the motoring public. Even after he crashed, Moore continued to shoot at police.  At that point, law enforcement was able to return fire, wounding Moore and putting an end

3 The female driver of the blue Mustang, A.O., was an unwitting participant in Moore's flight from police.  She had encountered Moore while searching for her boyfriend and believe that Moore's name was "Bryan."  A.O. agreed to give Moore a ride to a location a short distance away, at which time Moore placed a shotgun in A.O.'s Mustang and entered the passenger side of the vehicle.  A.O. was unaware that Moore was also in possession of a handgun, and she did not know that he was running from police.  When police attempted to stop the vehicle, Moore instructed A.O. to stop the car and "pop the trunk."  A.O. did stop the vehicle, at which time Moore jumped out, produced the handgun, and fired at officers.  A.O. put her hands in the air, screamed that there were children in the vehicle, and remained at the scene as Moore fled on foot.  Police recovered a shotgun from A.O.'s trunk.
4 Moore's gunshots also punctured the radiator of R.J.'s government vehicle, disabling it. Thereafter, R.J. and D.L. were transported by other law enforcement officers to D.L.'s police vehicle, at which time R.J. and D.L. were able to resume their search for Moore.

to his crime spree.[5]  Given the number of shots fired, it is little short of a miracle that neither Moore nor anyone else was killed.

On July 29, 2019, Moore made not one, but a *series* of conscious decisions to engage in violent criminal activity. He enlisted the assistance of an unwitting accomplice, whose two young children were placed in grave danger by virtue of Moore's conduct.  He attempted to kill a federal Task Force Officer and a detective, and he carjacked an innocent man.  He did so with a firearm that he could not lawfully possess, which he had stolen (along with multiple other firearms) in a residential burglary hours earlier.  At every turn, when Moore had the opportunity to surrender or simply to stop his violent rampage, he chose instead to further escalate it.

The offenses to which Moore has pleaded guilty would be astonishingly serious no matter who the victims. That two of the victims are law enforcement officers cannot be overlooked.  These are men who left their homes and families and knowingly placed themselves in harm's way to protect their community from Moore.  Despite the danger, they persisted and worked tirelessly to capture Moore before he could hurt anyone else. We do not ask these things of ordinary citizens, yet we routinely ask them of law enforcement officers, who willingly accept the risk as simply "part of the job."  In the government's view, we must not grow numb to the relentless violence that plagues our communities as a result of dangerous criminals like Elijah Moore. We must identify it and those who perpetrate it, and we must address that violence accordingly. Moore's breathtaking display of violence demands a sentence of 420 months.

---

5 After Moore crashed, R.J. led a team that approached Moore's vehicle to take him into custody.  The government anticipates that R.J. will address his involvement in that effort at the time of sentencing.

## II.        The History and Characteristics of the Defendant

Having considered the nature and circumstances of his offenses, this Court must next review and analyze Moore's history and characteristics.  It is perhaps here where the Government finds its strongest evidence of the need for a 420-month sentence.

Moore's counsel has filed a lengthy Sentencing Memorandum on his behalf.  (Doc. #50). The document painstakingly details Moore's upbringing and youth.  The Government does not dispute that some aspects of Moore's life could properly be characterized as tragic.  However, even those circumstances being what they are, Moore's history and characteristics suggest that a very lengthy sentence is indicated.[6]

### a.   <u>1998 Assault in the Second Degree</u>[7]

Moore's introduction into the adult criminal justice system occurred at the age of 16. (Doc. #60, ¶53).  This first offense was so serious that he was sentenced to 5 years in the Missouri Department of Corrections.   According to the summary Pre-Sentence Investigation Report, to which Moore has not objected, Moore was charged with Assault in the Second Degree and Armed Criminal Action after he stuck a female victim, C.S., *in the head with a baseball bat.*  Perhaps the most alarming aspect of this offense is that it was apparently precipitated by the victim simply having asked Moore to leave her residence.  Moore did leave the residence but warned that he

---

6 In consideration of the sensitive nature of the information regarding Moore's personal background, the government declines to summarize it here.  Much of the information contained in the Pre-Sentence Investigation Report regarding Moore's childhood and upbringing was provided by Moore's mother.  Some, although not all, of the information was corroborated by records obtained by Moore's counsel as outlined in the Sentencing Memorandum filed on his behalf. (Doc. #50; Doc. #60, ¶75).

7 The dates utilized herein correspond to "Date of Arrest," as reported by the United States Probation Office in the Pre-Sentence Investigation Report. (Doc. #60).  The "Date of Arrest" is not necessarily synonymous with the date of the offense.

would return.  When he did return, he was armed with the baseball bat, which he used to strike the victim in the head.  (Doc. #60, ¶53).

This was not an offense that resulted from a sudden, uncontrolled rage.  Rather, it was the product of deliberate thought and planning.  Having apparently argued with the victim, Moore left her residence, and foretold his plan as he did so.  True to his word, Moore returned to the victim's house and brought with him a baseball bat.  In the government's view, there can be no reasonable explanation for Moore having returned with a baseball bat other than that he returned for the specific purpose of assaulting the victim with the bat.  Here, as in the instant case, Moore had every opportunity to choose a path other than violence.  Instead, he returned to exact revenge against the victim for her having slighted him by asking him to leave. His need for retribution was apparently so strong that he made a return trip to her residence in order to violently assault her.

While incarcerated for the Assault in the Second Degree, Moore incurred numerous conduct violations including, but not limited to: threats; assault; fighting; possession or use of an intoxicating substance, and; contraband.  After he was sent to a treatment center, Moore exhibited "unacceptable" behavior by, among other things, threatening staff. Then, once released on parole, Moore continued to incur violations, including failure to complete a treatment program and testing positive for marijuana, cocaine, and heroin. In addition, Moore committed new offenses while on parole supervision.  He was conditionally released and returned to custody on multiple occasions. (Doc. #60, ¶53).

**b.  1999 Burglary in the Second Degree**

Before he was sentenced to prison in the 1998 case, Moore was arrested again and charged with Burglary in the Second Degree. (Doc. #60, ¶54).  According to the Pre-Sentence Investigation Report (to which Moore has not objected), Moore went to a boarding house where he kicked in a

door to a resident's room and confronted him about money that Moore believed he was owed.  The victim retreated, and Moore once again kicked down a door to confront the victim.  The victim obtained a pellet gun and pointed it at Moore, at which time Moore struck the victim in the face. (Doc. #60, ¶54).  Even after the victim – who was in his own home – retreated two separate times in an effort to escape Moore, Moore pursued the victim.  And even with a pellet gun pointed at him, Moore attacked.  Ultimately, Moore received a five-year sentence, which he appears to have served concurrently with his sentence on the foregoing Assault in the Second Degree.

### c.  June 2002 Assault in the Second Degree

On June 20, 2002 – approximately one month after he was conditionally released from prison – Moore was arrested for Assault in the First Degree with Serious Physical Injury. (Doc #60, ¶55).  In this case, Moore's weapon of choice was not a baseball bat but a stabbing instrument, which he used to stab victim G.T. *in the neck.*  (Doc. #60, ¶55).  Both the Probation Office and the Government attempted to obtain copies of the investigative reports for further details, only to be thwarted by the age of the case and small size of the investigative agency.  Nevertheless, it seems difficult to imagine that Moore would have stabbed the victim in the neck with any intention other than to kill the victim.

### d.  December 2002 Theft/Stealing

In December 2002, Moore committed a comparatively innocuous offense when he stole a television valued at more than $500.  (Doc. #60, ¶56).  While this offense pales in comparison to Moore's others, it is important to note that Moore's sentence was ordered to run concurrently to the sentence imposed for the June 2002 Assault in the Second Degree. (Doc. #60, ¶56).  Rather than simply incarcerating him for as long as possible, the sentencing court showed leniency to the 20-year-old Moore.   Sadly, Moore responded by committing additional offenses.

### e.  January 2003 Assault on a Law Enforcement Officer/Armed Criminal Action

It appears that Moore was conditionally released from the Missouri Department of Corrections on October 15, 2002.  (Doc. #60, ¶53).  Approximately two months later, on December 24, 2002, Moore violently attacked a law enforcement officer who had responded to Moore's mother's call for assistance.  (Doc. #60, ¶57).  According to a summary contained the Pre-Sentence Investigation Report to which Moore has not objected, Moore charged at an officer with a knife, causing the officer to jump down a flight of stairs to avoid being stabbed or cut.  (Doc. #60, ¶57).  Moore then threw an object at the retreating officer (presumably to further distract him) and escaped.  (Doc. #60, ¶57).  Moore was located arrested on January 5, 2003 and subsequently entered pleas of "guilty" to Assault on a Law Enforcement Officer in the Second Degree and Armed Criminal Action.[8] (Doc. #60, ¶57).   In September 2005, Moore was sentenced to terms of 15 years in prison on both counts, to be served concurrently.  (Doc. #60, ¶57; Case.net: 12R050300083-01 - Docket Entries (mo.gov)).

While incarcerated in the Missouri Department of Corrections for his 2003 convictions, Moore received any number of conduct violations. These violations ranged from the mundane (use of the telephone in an unauthorized way) to the criminal (making/transporting/possession of a firearm or weapon).  (Doc. #60, ¶57).  Moore apparently also incited a riot and, in a separate incident, started a fire.  (Doc. #60, ¶57).  Moore was conditionally released from prison on May

---

[8] Inexplicably, it appears that Moore did not remain in custody following this incident.  Based upon information obtained from Missouri Case Net, it appears that Moore was charged with this offense sometime in March 2003.  Case.net: 12R050300083 - Docket Entries (mo.gov)  In any event, Moore was clearly not confined in 2004, because he was arrested *five times* in that year alone.  (Doc. #60, ¶¶58-62).  One of those arrests involved a misdemeanor traffic charge resulting from a crash from which Moore fled.  (Doc. #60, ¶59).  Another involved Moore resisting arrest by fleeing from law enforcement.  (Doc. #60, ¶59).  The Government is at a loss to explain why Moore remained at large for the duration of this period.

20, 2019, just 70 days before he attempted to kill two federal officers on July 29, 2019.  (Doc. #60, ¶57).

### f.  September 2004 Unlawful Use of a Weapon – Carrying Concealed Weapon and Unlawful Use of a Weapon – Exhibiting

In September 2004, Moore – having already been charged with Assault on a Law Enforcement Officer in the Second Degree and Armed Criminal Action - was discovered to be in possession of a concealed knife.  (Doc. #60, ¶61).  Remarkably, Moore was evidently released once again, because five days later, on September 9, 2004, Moore was arrested for Unlawful Use of a Weapon – Exhibiting.  (Doc. #60, ¶62).  According to the Pre-Sentence Investigation Report, victim C.R. reported that she stopped her vehicle to speak with Moore and his then-girlfriend, at which time Moore jumped into C.R.'s vehicle.  Moore instructed C.R. to leave the area because there was a police officer nearby and Moore had a gun.  (Doc. #60, ¶62).  Moore then requested that C.R. give him money for his child's birthday. When C.R. refused, Moore demanded a blank check in C.R.'s possession and instructed C.R. to write the check to Moore's then-girlfriend.[9] (Doc. #60, ¶62).  After making several attempts to cash the check (all of which were apparently unsuccessful), Moore discharged his firearm into the floorboard of C.R.'s vehicle and threatened C.R. and others.[10] (Doc. #60, ¶62).  Moore subsequently entered a plea of guilty and was sentenced to a term of 7 years, to be served consecutively to the 7-year sentence imposed as to the September 4, 2004 incident.  (Doc. #60, ¶62).

The Government is mystified as to how and why Moore remained free to continue his crime wave in this manner.  Surely Moore must have been subject to some conditions during 2004,

---

9 The blank check did not belong to C.R.
10 Moore was apparently charged with this offense on or about September 24, 2004.  Case.net: 04A8-CR01057 - Docket Entries (mo.gov)

having been arrested for (and charged with) serious felony offenses in January 2003.  Yet, time and again he was released from custody only to re-offend in an escalating series of incidents.

### g.  March 2005 Assault in the Third Degree

Recognizing that Moore's 2005 offense was charged as a misdemeanor, the Government notes it here for the simple fact that at the time the incident occurred, Moore was facing multiple charges for multiple felony incidents outlined above.  (Doc. #60, ¶¶57-62).  It seems clear that not even a lengthy prison sentence deterred Moore from victimizing others, as on March 9, 2005, Moore punched victim L.T. in the face.  (Doc.#60, ¶63).  Once again, Moore pled guilty.

### h.  2009 Possession of a Weapon in a Correctional Facility

Fortunately, it appears that sometime in 2005 Moore was confined and remained incarcerated, because in September 2005, he was sentenced on multiple pending cases and his years-long crime spree came to a temporary end. (Doc. #60, ¶¶57, 58, 59, 61, 62, 63).  However, even incarceration in the Missouri Department of Corrections did not deter Moore from committing further crimes.  On March 8, 2008, Moore was discovered to be in possession of a stabbing weapon *while incarcerated in the Eastern Reception Diagnostic Correctional Center.* (Doc. #60, ¶64).  Moore subsequently entered a guilty plea and, despite the offense having occurred in a prison facility and Moore's designation as a Prior and Persistent Offender, the court once again showed leniency and imposed Moore's 12-year sentence concurrently with all other sentences he was serving.  (Doc. #60, ¶64; Case.net: 04A8-CR01057 - Docket Entries (mo.gov)).

### i.  2011 Possession of a Weapon in a Correctional Facility

Still undeterred and unrepentant, Moore continued to possess weapons in Missouri Department of Corrections facilities.  On May 2, 2011, Moore was discovered to be in possession of another weapon and charges were brought against him in 2012.  (Doc. #60, ¶65,  Case.net:

12TE-CR00575-01 - Charge Information (mo.gov)).  After he pled guilty, Moore was sentenced to a term of 6 years in the Missouri Department of Corrections.  (Doc. #60, ¶65).

### j.  2012 Violence to an Inmate of the Department of Corrections

On April 4, 2012, Moore committed perhaps his most egregious offense apart from the ones currently before this Court.  On that date, Moore, who was still incarcerated in the Missouri Department of Corrections, stabbed a fellow inmate in the left side of his neck.  (Doc. #60, ¶66). It appears that Moore was charged in August 2012.  Case.net: 12SF-CR01572 - Docket Entries (mo.gov).  In March 2013, Moore entered a plea of guilty and was sentenced to a term of 7 years in the Missouri Department of Corrections, inexplicably to be served concurrently with his other sentences.[11]

A review of Moore's Sentencing Memorandum might tempt an observer to believe that Moore, now 39, is in search of redemption and has dedicated himself to meaningful rehabilitation. (Doc. #50, pp. 18-23).  In fact, the Memorandum rather hopefully characterizes Moore as "[e]xhausted and ready to make a change."  (Doc. #50, p. 18).  According to the Memorandum, Moore's quest for redemption began "[t]he last time he was in prison" and, more specifically, in 2017.  (Doc. #50, p. 18, pp. 20-21).

As a preliminary matter, the government neither confirms nor denies the claims made in Moore's Sentencing Memorandum at pages 18 through 24.  Even assuming, however, that Moore's summary is entirely accurate, his more recent behavior unequivocally demonstrates that Moore has not experienced a miraculous epiphany that portends a change in his behavior.

---

11 The government made a formal request to the Missouri Department of Corrections for Moore's inmate file, including his disciplinary history.  Despite having been assured that the records would be provided, the government has yet to receive them.

When Moore was initially arrested in the instant case, he was housed in the St. Charles County Jail.  This location was not chosen at random and, indeed, was not chosen by federal authorities.  Because Moore had been charged in the 11th Judicial Circuit Court in and for St. Charles County and appeared in this Court pursuant to a writ of habeas corpus ad prosequendum, Moore remained in the primary custody of St. Charles County authorities until State charges were ultimately dismissed.

To say that Moore did not take well to his confinement in the St. Charles County Jail would be putting it mildly.  Moore spent much of his time drawing on the walls of his jail cell.  His drawings were as prolific as they were disturbing.  On virtually every available surface, Moore drew depictions of headstones.  Not just any headstones – headstones bearing the names of actual St. Charles County Corrections Officers and/or supervisors.  Beneath their names, which were surrounded by flames, Moore drew the letters "F.T.P.," commonly understood shorthand for "f*** the police."  On one headstone, Moore wrote an officer's name and "F.T.P." followed by the designation "Top Coward."  A sampling of Moore's artwork will be presented at sentencing as government's Exhibits 1, 2, and 3.[12]

Moore's derision was not uniquely geared toward corrections officers.  Indeed, it was not limited to State law enforcement officers; rather, Moore included the United States Marshals Service in his vitriolic displays.  Placed among the headstones Moore drew on the walls of his cell was a headstone marked "U.S. Marshals," with the letters "F.T.F." below[13.]  The headstone also bore a lightning bolt, a commonly recognized symbol associate with white supremacist groups.  SS Bolts | Hate Symbols Database | ADL.  (To be offered as Government's Exhibit 4).  According

---

12 In order to protect the identities and privacy of the named officers, the government has not attached the photographs hereto, but shall offer them at the time of sentencing, with a request that the same be filed under seal or redacted.
13 "F.T.F." is commonly used shorthand for "f*** the Feds."

to information provided by the St. Charles County Jail, Moore had been placed in that cell in January 2020 and at that time, the walls were free of drawings or graffiti.  Copies were provided to counsel for the government (and thereafter, to defense counsel) in March 2020.

After State charges against Moore were dismissed, and in view of his behavior in the St. Charles County Jail, the United States Marshals Service transferred Moore to the Marion County Jail in rural Missouri.  There, on December 4, 2020, Moore participated in inciting an uprising during which several inmates disabled surveillance cameras in F-Pod and G-Pod.  The cameras were obscured for a period of approximately one hour, during which time inmates (including Moore) flooded cells and otherwise damaged the jail.  Undermanned, the Marion County Jail summoned assistance from the Marion County Sheriff's Office, the Palmyra Police Department, and the Missouri Highway Patrol.  In a coordinated effort, large numbers of officers entered the two pods and Moore was escorted to the booking area, where he was searched.  He was then moved to an isolation cell, where he reported that the uprising had occurred because of inmate dissatisfaction with the manner in which electronic cigarettes were distributed.  Moore advised staff that he was "in prison for life" and that engaging in these activities was "the only way he could get matters addressed."  Upon review of the surveillance footage from December 4, 2020, Marion County Jail officers identified Moore and five other inmates as the individuals who had taken direct action to disable cameras and/or otherwise thwart officers' attempts to restore order. Moore was transferred from the Marion County Jail at the request of that facility's administration.14

Moore's eleventh-hour claim that he is "[e]xhausted and ready for a change" is as self-serving as it is provably false.  Any suggestion that he experience a life-changing revelation in

---

14 Moore was relocated to the Pulaski County Jail in Illinois.  The government has requested information from that facility, but it has not yet been received.

2017 that caused him to drastically alter his outlook or behavior is dubious at best. Indeed, each of the offenses charge in the instant case occurred *after* Moore's alleged epiphany.  His violent nature continues to reveal itself in his post-arrest conduct, and his desire to seek retribution for those he perceives have wronged him is readily apparent.  Moore seems, quite frankly, to be *incapable* of meaningful change.  A review of his history and characteristics strongly suggests that Moore must be incarcerated until he is either incapacitated by age, or the prospect of spending his remaining years in prison acts as a sufficient deterrent.[15]

### III.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

After analyzing the nature and circumstance of the offense and history and characteristics of the defendant, this Court must attempt to fashion a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense.  To reiterate the above, it seems difficult to imagine a more serious offense, apart from an intentional homicide or sex offense.  It is only by sheer fortuity that no one was seriously injured or killed during Moore's rampage.

At the risk of belaboring Moore's extensive criminal history, the government would be remiss if it did not observe that Moore's criminal history, and particularly his tendency to commit new crimes while on probation or parole supervision, strongly evidences a total lack of respect for the law.  He has demonstrated a complete disregard for the conditions of supervision that have been imposed upon him over the last two decades.  Even lengthy prison sentences have failed to

---

15 It is crucial to recall that even a sentence of 420 months represents a *downward variance* from the advisory sentencing range derived from Moore's conduct and his criminal history.

correct his anti-social behavior.  As a result, the government is concerned that only the strongest sentence will impress upon defendant Moore any sense of respect for the law.

The Court's obligation to determine a "just punishment" for this offense is, in the government's view, unenviable.  The government recognizes that punishment for punishment's sake is not only ineffective, but in many instances, it is counter-productive.  As a nation, we have acknowledged that while punishment is appropriate, punishment must be tempered with mercy and rehabilitation. The government does not take lightly its recommendation in this case.  It is made after careful consideration of Moore's upbringing, his physical health, and his lengthy history of recidivist behavior, which culminated in his attempt to kill two federal officers.  The government has not ignored the information outlined in the Moore's Sentencing Memorandum. (Doc. #50).  To the contrary, it is in recognition of that information that the government has agreed to recommend a sentence that would represent a downward variance of 60 months from the low-end of the advisory sentencing range.  But for the circumstances of Moore's upbringing, the government would have sought an even higher sentence.

Moore has demonstrated over a period of some 20 years that he is not amenable to rehabilitation and his current claim that he wishes to change his life is unpersuasive.  His continued criminal behavior has victimized many and certainly could have resulted in the deaths of any number of law enforcement officers.  The government respectfully suggests that a sentence of 420 months is necessary and appropriate to reflect the extraordinarily serious nature of Moore's offenses, to promote respect for the law, and to provide just punishment.

IV.     **The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct and to Protect the Public from Further Crimes of the Defendant**

The Court must also consider the need for the sentence imposed to afford adequate deterrence to criminal conduct.  Moore's criminal history clearly demonstrates that prison sentences of various lengths have failed to deter him from continuing to commit crimes. To the contrary, he seems completely unfazed by having spent years of his life incarcerated and/or under the supervision of one or more courts.  It seems abundantly evident that only a severe sanction stands any chance of deterring Moore from further crimes.  Society has the right to expect, and indeed demand, that offenders with a lengthy history of violent behavior be removed from the community lest he victimize others.

Candidly, the government remains skeptical that *any* sentence of *any* length will deter Moore from committing future crimes.  As a result, the government is steadfast in its belief that it is obliged to protect the public to the greatest extent possible by incarcerating Moore until he is effectively incapacitated by age.  He has clearly demonstrated that he simply cannot be trusted to adhere to societal mandates as basic as not savagely assaulting others with weapons and not possessing and using firearms.  In the government's view, only by removing Moore from "the public" can it be adequately protected from further crimes it seems he will almost inevitably commit.[16]

---

16 Not even prison walls have deterred Moore from engaging in violent crimes, as evidenced by his 2012 conviction for Violence to an Inmate of the Department of Corrections.  (Doc. #60, ¶66).

**V.      The Need for the Sentence Imposed to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

It is the government's sincere hope that, while incarcerated, Moore will avail himself of whatever educational or vocational training is made available to him.  Perhaps by improving his educational proficiency, Moore – who has no formal education beyond 8th grade - will be better positioned to acquire gainful employment following his release.  Similarly, it appears that Moore would benefit from substance abuse treatment, which treatment will be available to him through the Federal Bureau of Prisons.  The Pre-Sentence Investigation Report suggests that Moore has used numerous illicit controlled substances throughout his life.  The government urges the Court to recommend that Moore be evaluated for participation in the Residential Drug Abuse Program available through the Bureau of Prisons.  In the government's view, substance abuse treatment is a necessary component to any rehabilitative effort, without which Moore poses an even greater risk to reoffend.

**VI.     The Kinds of Sentences Available and the Sentencing Range Established for the Applicable Category of Offenses Committed by the Applicable Category of Defendant as Set Forth in the Guidelines**

The Court must also consider the kinds of sentences available prior to determining what sentence it will impose.  As the Probation Office correctly notes, Moore in ineligible for probation. (Doc. #60, ¶¶116-118).   Given the nature of his offenses, particularly the violation of Title 18, United States Code, Section 924(c), the Court must impose a term of imprisonment.  Not even Moore himself suggests otherwise.

**VII.    The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

The government submits that, in the instant case, the Court should impose a sentence of 420 months in order to avoid unwarranted sentencing disparities among similarly situated defendants who have been found guilty of similar conduct.   As the Pre-Sentence Report demonstrates, defendants with records like Moore's fall into a Criminal History Category VI – the highest available Criminal History Category under the Guidelines.  The Probation Office correctly notes that had Moore been convicted of Count V – Felon in Possession of a Firearm, his mandatory minimum sentence *for that offense alone* would have been 15 years.  (Doc. #60, ¶111).   If convicted of Counts IV and VIII  - Discharge of a Firearm in Furtherance of a Crime of Violence, Moore would have been subject to a mandatory minimum sentence of ten years *per count*,  which would necessarily have been ordered to run consecutively to all other sentences.  Adding to those sentences the one for Count II (which also must be served consecutively), Moore's mandatory minimum sentence had he been convicted of all seven counts would have been 45 years (540 months). (Doc. #60, ¶¶106-112).  The government is urging a sentence 10 years (120 months) *lower* than Moore's mandatory minimum sentence in the event of conviction at trial.  Any sentence lower than 420 months would result in a glaring and unwarranted sentencing disparity between Moore and similarly situated defendants who committed similar offenses.[17]

---

17 Various courts of appeals have upheld even life sentences in cases in which the conduct was analogous to – or less serious than - Moore's.   See United States v. Colbert, 828 F.3d 718 (8th Cir. 2016) (sentence of life imprisonment not substantively unreasonable where defendant was convicted of drug conspiracy and discharging a firearm in furtherance of a drug trafficking crime and his advisory guidelines range was life plus ten years); United States v. Osborne, 739 Fed. Appx. 11 (2nd Cir. 2018)(sentence of three life terms plus 135 years not substantively unreasonable where defendant was convicted of racketeering conspiracy, Hobbs Act robbery, conspiracy to commit murder, attempted murder, discharge of a firearm in furtherance of a crime of violence and other offenses); United States v. Hoffman, 707 F.3d 929 (8th Cir. 2013) (life sentence not substantively where defendant was convicted of drug trafficking conspiracy and conspiracy to commit money laundering and defendant's criminal conduct had escalated following previous conviction for similar offense); United States v. Thomas, 656 Fed. Appx. 951 (2016) (life sentence not substantively unreasonable where defendant was convicted of felon in possession of a firearm and

## **CONCLUSION**

For the foregoing reasons, and in consideration of the statutory sentencing factors enumerated in Title 18, United States Code, Section 3553(a), the government respectfully requests that the Court impose a total aggregate sentence of 420 months.

Respectfully submitted,

SAYLER A. FLEMING
United States Attorney


  /s/  Sirena Miller Wissler
SIRENA MILLER WISSLER, #55374MO
NAUMAN WADALAWALA #65252MO
Assistant United States Attorney
111 South 10th Street, Room 20.333
St. Louis, MO 63102
(314) 539-2200


## **CERTIFICATE OF SERVICE**


I hereby certify that on this 22nd day of February, 2021, a true and correct copy of the foregoing was filed electronically with the Clerk of the Court, to be served by way of the Court's electronic filing system upon Melissa Goymerac,  attorney for defendant Elijah Moore.


  /s/ Sirena Miller Wissler
SIRENA MILLER WISSLER
Assistant United States Attorney

---

qualified as an Armed Career Criminal, in part because the conduct underlying the conviction included defendant shooting at multiple police officers). See also United States v. Farah, 899 F.3d 608 (8th Cir. 2018) (420 month sentence for conspiracy to commit murder abroad not substantively unreasonable).